FILED
2011 Apr-12  AM 10:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA MIDDLE DIVISION

**EVIE ELIZABETH HOWARD**
**as personal representative of the**
**estate of Paul Anthony Smith**

        **Plaintiff,**

**v.**                            **CV 10-PT-2203-M**

**SOUTHERN HEALTH PARTNERS,**
**INC., JEFFREY REASONS;**
**KILPATRICK; DEIDRE MALONE;**
**MICHELLE WADE; TERRY SURLES;**
**TERRY MARCRUM; MYRTIS MOSS;**
**JORETHA MITCHELL; CHARLES**
**GASTON; JACKIE FORMAN;**
**ST. CLAIR COUNTY, ALABAMA;**
**PELL CITY, ALABAMA and**
**ALFONZO STINSON,**

        **Defendants.**

## MEMORANDUM OPINION

This cause comes on to be heard on Defendant St. Clair County, Alabama's Motion to Dismiss the First Amended Complaint filed on November 22, 2010; Defendants Terry Surles, Terry Marcrum, Myrtes Moss, Charles Gaston and Joretha Mitchell's Motion to Dismiss the First Amended Complaint filed on November 22, 2010; Defendant Alfonso Stinson's Motion to Dismiss the First Amended Complaint filed  on December 27, 2010; and Motion to Dismiss filed by defendant Jackie Foreman on December 30, 2010.

### PURPORTED FACTUAL ALLEGATIONS IN FIRST AMENDED COMPLAINT

The court will initially attempt to navigate the maze of allegations in the First Amended Complaint to determine what purport to be factual allegations pertaining to various defendants.

Some of the allegations apply to more than one defendant and, therefore, will be repeated.[1]

## I.   Southern Health Partners, Inc. ("Southern Health"):

- Southern Health " is a private for-profit corporation that is under a contractual obligation to St. Clair County to provide medical care for inmates in St. Clair County's jails."
- "LPNs practicing without the supervision of a registered nurse falls far below the standard of correctional health care."
- Decedent Paul Anthony "Smith's serious medical needs were largely ignored because of the customs or policies of defendants Surles, Marcrum, Reasons, and Southern Health of deliberate indifference to the serious medical needs of prisoners in St. Clair's two jails."
- "More generally, defendants Surles, Marcrum, Reasons, and Southern Health have established deliberately indifferent customs or policies concerning inmate medical care, including but not limited to (1) a custom or policy of delaying or denying medical treatment to prisoners because they were non-county inmates; and (2) a custom or policy of delaying or denying necessary medical treatment to avoid liability for prisoner medical bills."
- "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City were also part of an explicit or implicit agreement or plan to delay or deny necessary medical care to inmates needing medical care to avoid having to pay for medical care for the inmates. This plan included a custom or policy of delaying or denying necessary medical treatment to give officials time to have the inmate needing treatment released from custody before receiving the treatment. Defendants were aware this policy created a substantial risk of serious harm and inflicted unnecessary pain and suffering on inmates."
- "Delaying or denying necessary medical treatment has been a standard practice of Southern Health Partners in St. Clair County (and presumably elsewhere) for years. *See Pearson v. Southern Health Partners*, No. 4:03-cv-01461 (filed August 19, 2003, based on 2001 conduct)." "A Pacer search indicates that Southern Health Partners has been a defendant in numerous cases involving delay and denial of necessary medical treatment." "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City have chosen to continue the status quo regarding deficient medical care at the St. Clair County jails, relying on Southern Health's insurance company to deal with cases and claims."
- "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City were on notice that the above-described customs or policies regarding medical care for inmates were harmful to the health of inmates and caused them to experience unnecessary pain and suffering due to delay and denial of necessary medical care. Defendants had such knowledge from prisoner complaints, communications from corrections officers, from their own observations, from common sense, from other lawsuits, and in other ways."
- "To a large extent, these constitutionally-deficient policies and practices regarding inmate medical care were created and implemented by the written agreement between St. Clair County and Southern Health."
- "Attached as Exhibit 1 to this complaint is the Health Services Agreement (HSA) between

---

[1]  Some of the allegations may be more in the nature of conclusions.

St. Clair County and Southern Health. This contract is personally signed by defendant Reasons and incorporates by reference two letters from defendant Reasons, one to the St. Clair County administrator and the other to defendant Marcrum."

- "In paragraphs 8.1 - 8.3 [of the HSA], Southern Health agrees to provide $5 million in insurance, to name the county and the sheriff as additional insureds, and to indemnify the sheriff, the county, and their agents and employees in connection with 'any and all claims, actions, lawsuits, damages, judgments or liabilities of any kind whatsoever arising out of the operation and maintenance of the aforesaid program of health care services.'"

- "Under the HSA, for St. Clair to avoid liability for excess medical care expenses (see paragraph 1.5), it was necessary for defendants Surles and Marcrum and the correctional officers they managed to cooperate with Southern Health in controlling costs." "The letters attached to the HSA reflect negotiation between Southern Health and St. Clair County and defendants Marcrum and Surles regarding cost control issues at the St. Clair County jail facilities, in particular the facility in which plaintiff was incarcerated in Pell City."

- "Defendants St. Clair, Southern Health, Surles, Marcrum, and Reasons were all aware the cost control measures implemented at St. Clair County's jails by Southern Health resulted in the denial of constitutionally-required medical care for inmates with serious medical needs such as Smith."

- "Because of the long-term relationship between defendants Surles, Marcrum, Reasons, St. Clair, and Southern Health, all these defendants were aware of the consequences to inmates of using Southern Health as the medical provider.  Southern Health was maintained as the provider based on cost alone and despite the long history of inadequate medical care." "In order to control costs, defendants Southern Health and Reasons, with the knowledge and consent of defendants St. Clair, Surles, and Marcrum, staffed the St. Clair jail facilities inadequately, denied inmates medications (like insulin), and delayed or denied medically-necessary referrals to outside providers, including necessary emergency medical treatment like that denied Smith."

## II.   Jeffrey Reasons ("Reasons"):

- "Reasons was employed by Southern Health as its CEO at all relevant times.  He is sued in his individual capacity only."

- "Smith's serious medical needs were largely ignored because of the customs or policies of defendants Surles, Marcrum, Reasons, and Southern Health of deliberate indifference to the serious medical needs of prisoners in St. Clair's two jails."

- "With deliberate indifference to the serious medical needs of diabetic inmates, defendants Surles, Marcum, and Reasons failed to develop and implement adequate policies and procedures for the handling of diabetic inmates and failed to adequately train jail correction officers and medical staff, with the foreseeable result that inmates such as Smith would not receive appropriate treatment and monitoring."

- "More generally, defendants Surles, Marcrum, Reasons, and Southern Health have established deliberately-indifferent customs or policies concerning inmate medical care, including but not limited to (1) a custom or policy of delaying or denying medical treatment to prisoners because they were non-county inmates; and (2) a custom or policy of delaying

or denying necessary medical treatment to avoid liability for prisoner medical bills."

- "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City were also part of an explicit or implicit agreement or plan to delay or deny necessary medical care to inmates needing medical care to avoid having to pay for medical care for the inmate. This plan included a custom or policy of delaying or denying necessary medical treatment to give officials time to have the inmate needing treatment released from custody before receiving the treatment. Defendants were aware this policy created a substantial risk of serious harm and inflicted unnecessary pain and suffering on inmates."

- "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City have chosen to continue the status quo regarding deficient medical care at the St. Clair County jails, relying on Southern Health's insurance company to deal with cases and claims."

- "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City were on notice that the above-described customs or policies regarding medical care for inmates were harmful to the health of inmates and caused them to experience unnecessary pain and suffering due to delay and denial of necessary medical care. Defendants had such knowledge from prisoner complaints, communications from corrections officers, from their own observations, from common sense, from other lawsuits, and in other ways."

- "Defendants St. Clair, Southern Health, Surles, Marcrum, and Reasons were all aware the cost control measures implemented at St. Clair County's jails by Southern Health resulted in the denial of constitutionally-required medical care for inmates with serious medical needs such as Smith."

- "Defendant Reasons was and continues to be responsible for negotiating contracts between Southern Health and various counties and other governmental entities with a constitutional duty to provide medical care for inmates. Southern Health's business model, promulgated by defendant Reasons and implemented in numerous HSAs with the same language as the St. Clair HSA, succeeds by underbidding the competition and implementing severe cost control measures, the necessary result of which is unnecessary inmate suffering and death (dealt with through liability insurance)."

- Because of the long-term relationship between defendants Surles, Marcrum, Reasons, St. Clair, and Southern Health, all these defendants were aware of the consequences to inmates of using Southern Health as the medical provider. Southern Health was maintained as the provider based on cost alone and despite the long history of inadequate medical care." "In order to control costs, defendants Southern Health and Reasons, with the knowledge and consent of defendants St. Clair, Surles, and Marcrum, staffed the St. Clair jail facilities inadequately, denied inmates medications (like insulin), and delayed or denied medically-necessary referrals to outside providers, including necessary emergency medical treatment like that denied Smith."

## III.   Troy Kilpatrick, M.D. ("Kilpatrick"):

- Kilpatrick "was contracted by Southern Health to provide physician medical services at St. Clair's jail facilities at all relevant times."

- After noting an elevated blood sugar level, vomiting, and prescribing clear fluids, "Nurse Malone contacted the jail physician, Dr. Kilpatrick, by phone for the insulin order."

4

- "Kilpatrick, despite being informed regarding Smith's DKA [*i.e.*, diabetic acidosis] symptoms, did not come to see the patient or order an immediate transfer to the hospital emergency department."
- "Dr. Kilpatrick was aware that Smith had a dangerously high blood sugar and was vomiting, yet he did not arrange to see the patient or send him to the hospital emergency department. This falls far below the standard of correctional health care."

## IV.   Diedre Malone, R.N. ("Malone"):

- Malone "was employed by Southern Health to provide nursing medical services at St. Clair's Pell City jail facility at all relevant times."
- "Notwithstanding this medical history of serious medical needs, Smith was not referred to or seen by health care staff until 2:00 p.m. on November 19, 2008, when Smith was seen by Nurse Malone.  Smith reported vomiting and had a blood sugar of 491 mg/dl (normal range 80-120)."
- "Instead of calling a physician or arranging for immediate transfer to a hospital emergency department, Nurse Malone wrote that she would assess blood sugar after Smith ceased vomiting."
- "At 6:00 p.m. Nurse Malone nurse repeated the blood sugar and gave Smith some insulin. The repeat blood sugar was 463."
- "Nurse Malone prescribed clear fluids and noted that the vomiting was unwitnessed and must be witnessed by CO or medical staff."
- "Nurse Malone contacted the jail physician, Dr. Kilpatrick, by phone for the insulin order."
- "Nurse Malone's cynicism regarding a history of vomiting in a diabetic with a blood sugar approaching 500 mg/dl falls far below the standard of correctional health care."

## V.   Michelle Wade, L.P.N. ("Wade"):

- Nurse Wade "was employed by Southern Health to provide nursing medical services at St. Clair's Pell City jail facility at all relevant times."
- "At 8:00 a.m. on November 20, 2008, Smith was seen by Nurse Wade and CO Mitchell. Nurse Wade, an LPN, was working unsupervised by a registered nurse." "At this time Smith reportedly refused insulin and measurement of his blood sugar.  The reason documented was that Smith said, 'I'm not Paul Smith.'  This refusal and statement are indications of either confusion secondary to high blood sugar or severe mental illness, a condition Smith was known to have."
- "Nurse Wade was aware of Smith's medical condition and the risk that he would plunge further into life-threatening DKA yet she too completely failed to monitor Smith's conition [sic]."
- "On information and belief, the correction officer defendants and Nurse Wade were familiar with Smith's medical and psychiatric problems; were aware he was an insulin-dependent diabetic; were aware he was refusing food, insulin, and to have his blood sugar checked; and were aware Smith's conduct was jeopardizing his health and/or life.  Nevertheless, these defendants failed and refused to monitor Smith's condition."  "Moreover, these defendants

ignored Smith's requests for medical treatment."

- "Because of the proximity of cell A-10 to the jail control room the correction officer defendants and Nurse Wade could hear and did hear yelling and banging from Smith in A-10 and knew he was yelling for his insulin and/or in severe medical distress."  "Nevertheless, with deliberate indifference, these defendants ignored Smith."

## VI. Terry Surles ("Surles"):

- "Surles was the St. Clair County Sheriff at all relevant times.  As the sheriff, among other things, he is responsible for management of St. Clair County's two jail facilities.  He is sued in his individual capacity only."
- "Smith's serious medical needs were largely ignored because of the customs or policies of defendants Surles, Marcrum, Reasons, and Southern Health of deliberate indifference to the serious medical needs of prisoners in St. Clair's two jails."
- "With deliberate indifference to the serious medical needs of diabetic inmates, defendants Surles, Marcrum, and Reasons failed to develop and implement adequate policies and procedures for the handling of diabetic inmates and failed to adequately train jail correction officers and medical staff, with the foreseeable result that inmates such as Smith would not receive appropriate treatment and monitoring."
- "More generally, defendants Surles, Marcrum, Reasons, and Southern Health have established deliberately-indifferent customs or policies concerning inmate medical care, including but not limited to (1) a custom or policy of delaying or denying medical treatment to prisoners because they were non-county inmates; and (2) a custom or policy of delaying or denying necessary medical treatment to avoid liability for prisoner medical bills."
- "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City were also part of an explicit or implicit agreement or plan to delay or deny necessary medical care to inmates needing medical care to avoid having to pay for medical care for the inmate. This plan included a custom or policy of delaying or denying necessary medical treatment to give officials time to have the inmate needing treatment released from custody before receiving the treatment. Defendants were aware this policy created a substantial risk of serious harm and inflicted unnecessary pain and suffering on inmates."
- "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City have chosen to continue the status quo regarding deficient medical care at the St. Clair County jails, relying on Southern Health's insurance company to deal with cases and claims."
- "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City were on notice that the above-described customs or policies regarding medical care for inmates were harmful to the health of inmates and caused them to experience unnecessary pain and suffering due to delay and denial of necessary medical care.  Defendants had such knowledge from prisoner complaints, communications from corrections officers, from their own observations, from common sense, from other lawsuits, and in other ways."
- "In whole or in part because of paragraphs 8.1-8.3 [of the HSA], Surles and Marcrum have failed and refused to address known systemic deficiencies regarding medical care at the St. Clair jail facilities."
- "Defendants St. Clair, Southern Health, Surles, Marcrum, and Reasons were all aware the

cost control measures implemented at St. Clair County's jails by Southern Health resulted in the denial of constitutionally-required medical care for inmates with serious medical needs such as Smith."

• Because of the long-term relationship between defendants Surles, Marcrum, Reasons, St. Clair, and Southern Health, all these defendants were aware of the consequences to inmates of using Southern Health as the medical provider.  Southern Health was maintained as the provider based on cost alone and despite the long history of inadequate medical care." "In order to control costs, defendants Southern Health and Reasons, with the knowledge and consent of defendants St. Clair, Surles, and Marcrum, staffed the St. Clair jail facilities inadequately, denied inmates medications (like insulin), and delayed or denied medically-necessary referrals to outside providers, including necessary emergency medical treatment like that denied Smith."

## VII.  Terry Marcrum ("Marcrum"):

• "Marcrum was the administrator of St. Clair County's jail facilities at all relevant times and is jointly responsible with defendant Surles for the management of St. Clair County's jails. He is sued in his individual capacity only."

• "Smith's serious medical needs were largely ignored because of the customs or policies of defendants Surles, Marcrum, Reasons, and Southern Health of deliberate indifference to the serious medical needs of prisoners in St. Clair's two jails."

• "With deliberate indifference to the serious medical needs of diabetic inmates, defendants Surles, Marcrum, and Reasons failed to develop and implement adequate policies and procedures for the handling of diabetic inmates and failed to adequately train jail correction officers and medical staff, with the foreseeable result that inmates such as Smith would not receive appropriate treatment and monitoring."

• "More generally, defendants Surles, Marcrum, Reasons, and Southern Health have established deliberately-indifferent customs or policies concerning inmate medical care, including but not limited to (1) a custom or policy of delaying or denying medical treatment to prisoners because they were non-county inmates; and (2) a custom or policy of delaying or denying necessary medical treatment to avoid liability for prisoner medical bills."

• "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City were also part of an explicit or implicit agreement or plan to delay or deny necessary medical care to inmates needing medical care to avoid having to pay for medical care for the inmate. This plan included a custom or policy of delaying or denying necessary medical treatment to give officials time to have the inmate needing treatment released from custody before receiving the treatment. Defendants were aware this policy created a substantial risk of serious harm and inflicted unnecessary pain and suffering on inmates."

• "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City have chosen to continue the status quo regarding deficient medical care at the St. Clair County jails, relying on Southern Health's insurance company to deal with cases and claims."

• "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City were on notice that the above-described customs or policies regarding medical care for inmates were harmful to the health of inmates and caused them to experience unnecessary pain and

suffering due to delay and denial of necessary medical care.  Defendants had such knowledge from prisoner complaints, communications from corrections officers, from their own observations, from common sense, from other lawsuits, and in other ways."

- "In whole or in part because of paragraphs 8.1-8.3 [of the HSA], Surles and Marcrum have failed and refused to address known systemic deficiencies regarding medical care at the St. Clair jail facilities."

- "Defendants St. Clair, Southern Health, Surles, Marcrum, and Reasons were all aware the cost control measures implemented at St. Clair County's jails by Southern Health resulted in the denial of constitutionally-required medical care for inmates with serious medical needs such as Smith."

- Because of the long-term relationship between defendants Surles, Marcrum, Reasons, St. Clair, and Southern Health, all these defendants were aware of the consequences to inmates of using Southern Health as the medical provider.  Southern Health was maintained as the provider based on cost alone and despite the long history of inadequate medical care." "In order to control costs, defendants Southern Health and Reasons, with the knowledge and consent of defendants St. Clair, Surles, and Marcrum, staffed the St. Clair jail facilities inadequately, denied inmates medications (like insulin), and delayed or denied medically-necessary referrals to outside providers, including necessary emergency medical treatment like that denied Smith."

## VIII.  Myrtis Moss ("Moss"):

- "Moss was employed by Surles as a Captain and was the supervisor over St. Clair's Pell City jail facility at all relevant times.  She was responsible for supervising the day-to-day operation of the Pell City facility at all relevant times.  She is sued in her individual capacity only."

- "Between 8:00 a.m. and 5:00 p.m. the corrections officers on duty, including defendants Moss, Mitchell, Gaston, Foreman, and Stinson, completely failed to monitor Smith's condition."

- "On information and belief, the correction officer defendants and Nurse Wade were familiar with Smith's medical and psychiatric problems; were aware he was an insulin-dependent diabetic; were aware he was refusing food, insulin, and to have his blood sugar checked; and were aware Smith's conduct was jeopardizing his health and/or life.  Nevertheless, these defendants failed and refused to monitor Smith's condition."  "Moreover, these defendants ignored Smith's requests for medical treatment."

- "Because of the proximity of cell A-10 to the jail control room the correction officer defendants and Nurse Wade could hear and did hear yelling and banging from Smith in A-10 and knew he was yelling for his insulin and/or in severe medical distress."  "Nevertheless, with deliberate indifference, these defendants ignored Smith."

## IX.  Joretha Mitchell ("Mitchell"):

- "Mitchell was a corrections officer at the Pell City facility at all relevant times.  She is sued in her individual capacity only."

- "At 8:00 a.m. on November 20, 2008, Smith was seen by Nurse Wade and CO Mitchell." "At this time Smith reportedly refused insulin and measurement of his blood sugar. The reason documented was that Smith said, 'I'm not Paul Smith.' This refusal and statement are indications of either confusion secondary to high blood sugar or severe mental illness, a condition Smith was known to have."
- "Nurse Wade and CO Mitchell knew that Smith was not eating and was refusing medication and measurement of blood sugar."
- "Between 8:00 a.m. and 5:00 p.m. the corrections officers on duty, including defendants Moss, Mitchell, Gaston, Foreman, and Stinson, completely failed to monitor Smith's condition.
- "On information and belief, the correction officer defendants and Nurse Wade were familiar with Smith's medical and psychiatric problems; were aware he was an insulin-dependent diabetic; were aware he was refusing food, insulin, and to have his blood sugar checked; and were aware Smith's conduct was jeopardizing his health and/or life. Nevertheless, these defendants failed and refused to monitor Smith's condition." "Moreover, these defendants ignored Smith's requests for medical treatment."
- "Because of the proximity of cell A-10 to the jail control room the correction officer defendants and Nurse Wade could hear and did hear yelling and banging from Smith in A-10 and knew he was yelling for his insulin and/or in severe medical distress." "Nevertheless, with deliberate indifference, these defendants ignored Smith."

## X.   Charles Gaston ("Gaston"):

- "Gaston was a corrections officer at St. Clair's Pell City jail facility at all relevant times. He is sued in his individual capacity only."
- "Between 8:00 a.m. and 5:00 p.m. the corrections officers on duty, including defendants Moss, Mitchell, Gaston, Foreman, and Stinson, completely failed to monitor Smith's condition."
- "On information and belief, the correction officer defendants and Nurse Wade were familiar with Smith's medical and psychiatric problems; were aware he was an insulin-dependent diabetic; were aware he was refusing food, insulin, and to have his blood sugar checked; and were aware Smith's conduct was jeopardizing his health and/or life. Nevertheless, these defendants failed and refused to monitor Smith's condition." "Moreover, these defendants ignored Smith's requests for medical treatment."
- "Because of the proximity of cell A-10 to the jail control room the correction officer defendants and Nurse Wade could hear and did hear yelling and banging from Smith in A-10 and knew he was yelling for his insulin and/or in severe medical distress. "Nevertheless, with deliberate indifference, these defendants ignored Smith."

## XI.   Jackie Foreman ("Foreman"):

- "Foreman was a corrections officer at St. Clair's Pell City jail facility at all relevant times. She is sued in her individual capacity only."
- "Between 8:00 a.m. and 5:00 p.m. the corrections officers on duty, including defendants

Moss, Mitchell, Gaston, Foreman, and Stinson, completely failed to monitor Smith's condition."

- "On information and belief, the correction officer defendants and Nurse Wade were familiar with Smith's medical and psychiatric problems; were aware he was an insulin-dependent diabetic; were aware he was refusing food, insulin, and to have his blood sugar checked; and were aware Smith's conduct was jeopardizing his health and/or life.  Nevertheless, these defendants failed and refused to monitor Smith's condition."  "Moreover, these defendants ignored Smith's requests for medical treatment."
- "Because of the proximity of cell A-10 to the jail control room the correction officer defendants and Nurse Wade could hear and did hear yelling and banging from Smith in A-10 and knew he was yelling for his insulin and/or in severe medical distress."  "Nevertheless, with deliberate indifference, these defendants ignored Smith."

## XII.   Alfonso Stinson ("Stinson"):

- "Stinson was a corrections officer at St. Clair's Pell City jail facility at all relevant times.  He is sued in his individual capacity only."
- "Between 8:00 a.m. and 5:00 p.m. the corrections officers on duty, including defendants Moss, Mitchell, Gaston, Foreman, and Stinson, completely failed to monitor Smith's condition."
- "On information and belief, the correction officer defendants and Nurse Wade were familiar with Smith's medical and psychiatric problems; were aware he was an insulin-dependent diabetic; were aware he was refusing food, insulin, and to have his blood sugar checked; and were aware Smith's conduct was jeopardizing his health and/or life.  Nevertheless, these defendants failed and refused to monitor Smith's condition."  "Moreover, these defendants ignored Smith's requests for medical treatment."
- "Because of the proximity of cell A-10 to the jail control room the correction officer defendants and Nurse Wade could hear and did hear yelling and banging from Smith in A-10 and knew he was yelling for his insulin and/or in severe medical distress."  "Nevertheless, with deliberate indifference, these defendants ignored Smith."

## XIII.   St. Clair County, Alabama ("The County"):

- The County "is responsible for funding the county jails in St. Clair County, including funding for medical care at the jails."
- "Defendant St. Clair caused or contributed to the above-described customs or policies by not providing adequate funds for medical treatment for the prisoners in its custody, by providing a financial or other incentive for correction officers and medical personnel to delay or deny necessary medical treatment, and in other ways."
- "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City were also part of an explicit or implicit agreement or plan to delay or deny necessary medical care to inmates needing medical care to avoid having to pay for medical care for the inmate. This plan included a custom or policy of delaying or denying necessary medical treatment to give officials time to have the inmate needing treatment released from custody before receiving

the treatment. Defendants were aware this policy created a substantial risk of serious harm and inflicted unnecessary pain and suffering on inmates."

- "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City have chosen to continue the status quo regarding deficient medical care at the St. Clair County jails, relying on Southern Health's insurance company to deal with cases and claims."

- "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City were on notice that the above-described customs or policies regarding medical care for inmates were harmful to the health of inmates and caused them to experience unnecessary pain and suffering due to delay and denial of necessary medical care. Defendants had such knowledge from prisoner complaints, communications from corrections officers, from their own observations, from common sense, from other lawsuits, and in other ways."

- "Attached as Exhibit 1 to this complaint is the Health Services Agreement (HSA) between St. Clair County and Southern Health. This contract is personally signed by defendant Reasons and incorporates by reference two letters from defendant Reasons, one to the St. Clair County administrator and the other to defendant Marcrum."

- "Under the HSA, for St. Clair to avoid liability for excess medical care expenses (see paragraph 1.5), it was necessary for defendants Surles and Marcrum and the correctional officers they managed to cooperate with Southern Health in controlling costs." "The letters attached to the HSA reflect negotiation between Southern Health and St. Clair County and defendants Marcrum and Surles regarding cost control issues at the St. Clair County jail facilities, in particular the facility in which plaintiff was incarcerated in Pell City."

- "Defendants St. Clair, Southern Health, Surles, Marcrum, and Reasons were all aware the cost control measures implemented at St. Clair County's jails by Southern Health resulted in the denial of constitutionally-required medical care for inmates with serious medical needs such as Smith."

- Because of the long-term relationship between defendants Surles, Marcrum, Reasons, St. Clair, and Southern Health, all these defendants were aware of the consequences to inmates of using Southern Health as the medical provider. Southern Health was maintained as the provider based on cost alone and despite the long history of inadequate medical care." "In order to control costs, defendants Southern Health and Reasons, with the knowledge and consent of defendants St. Clair, Surles, and Marcrum, staffed the St. Clair jail facilities inadequately, denied inmates medications (like insulin), and delayed or denied medically-necessary referrals to outside providers, including necessary emergency medical treatment like that denied Smith."

## XIV.  Pell City, Alabama:

- "Pell City arranged for Smith's incarceration in St. Clair's Pell City jail facility and agreed to be responsible for all or part of his medical care while incarcerated."

- "Defendant Pell City caused or contributed to the above-described customs or policies by not providing adequate funds for medical treatment for the Pell City prisoners it placed in St. Clair's custody, by instructing jail and medical personnel to delay or deny necessary medical treatment for Pell City prisoners, by providing a financial or other incentive for correction officers and medical personnel to delay or deny necessary medical treatment for Pell City

prisoners, and in other ways."

- "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City were also part of an explicit or implicit agreement or plan to delay or deny necessary medical care to inmates needing medical care to avoid having to pay for medical care for the inmate. This plan included a custom or policy of delaying or denying necessary medical treatment to give officials time to have the inmate needing treatment released from custody before receiving the treatment. Defendants were aware this policy created a substantial risk of serious harm and inflicted unnecessary pain and suffering on inmates."

- "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City have chosen to continue the status quo regarding deficient medical care at the St. Clair County jails, relying on Southern Health's insurance company to deal with cases and claims."

- "Defendants Surles, Marcrum, Reasons, Southern Health, St. Clair, and Pell City were on notice that the above-described customs or policies regarding medical care for inmates were harmful to the health of inmates and caused them to experience unnecessary pain and suffering due to delay and denial of necessary medical care. Defendants had such knowledge from prisoner complaints, communications from corrections officers, from their own observation, from common sense, from other lawsuits, and in other ways."

## DEFENDANTS' GROUNDS FOR THEIR MOTIONS
## AND RELATED ARGUMENTS

Plaintiff Evie Elizabeth Howard, as personal representative of the estate of Paul Anthony Smith, asserts two counts against the fourteen (14) defendants within her First Amended Complaint ("FAC"). Although plaintiff names a number of defendants, they can be categorized into three general groups. The first group of defendants consists of governmental entities. They are: (1) St. Clair County, Alabama ("St. Clair County" or "the County"); and (2) Pell City, Alabama ("Pell City" or "the City").

The second group of defendants consists of defendant Southern Health Partners, Inc. ("Southern Health" or "SHP") and its employees and/or independent contractors. It includes: (3) Southern Health Partners, Inc.; (4) Jeffrey Reasons, C.E.O. of Southern Health Partners, Inc.; (5) Troy Kilpatrick, M.D.; (6) Diedre Malone, R.N.; and (7) Michelle Wade, L.P.N. Defendant Reasons is sued in his individual capacity. Plaintiff does not explicitly state the capacity in which the other defendants are being sued.

The third group of defendants are those who manage and/or otherwise work at "St Clair's Pell City jail facility."  Defendants in this group include: (8) Terry Surles, Sheriff of St. Clair County, Alabama; (9) Terry Marcrum, Chief at St. Clair County Sheriff's Department and administrator of St. Clair County's jail facilities; (10) Myrtis Moss, Captain at St. Clair County Sheriff's Department and supervisor of St. Clair's Pell City jail facility; (11) Joretha Mitchell, corrections officer; (12) Charles Gaston, corrections officer; (13) Jackie Foreman, corrections officer; and (14) Alfonzo Stinson, corrections officer.  All of the defendants listed in this category are sued in their individual capacity only.[2]

## Counts Alleged by Plaintiff in the First Amended Complaint

Count I is captioned "Deliberate Indifference to Serious Medical Needs."  At first glance, Count I appears to raise one claim, yet it may be  two distinct claims: (1) a group of eight defendants "were deliberately indifferent to Smith's serious medical needs," and (2) a different group of six defendants were "responsible for the unconstitutional customs and policies." As such, the only similarities between the two disparate claims are that both groups share a common fact pattern and that both acted to "deprive Smith of his rights as a pretrial detainee under the Fourteenth Amendment to the Constitution of the United States in violation of 42 U.S.C. § 1983."

Count I names every defendant.  In paragraph 87 (*i.e.*, "deliberately indifferent to Smith's serious medical needs"), plaintiff names eight defendants: (1) Moss; (2) Mitchell; (3) Gaston; (4) Foreman; (5) Stinson; (6) Malone; (7) Wade; and (8) Kilpatrick.  And in paragraph 88 (*i.e.*, "unconstitutional customs and policies"), plaintiff names the other six defendants: (1) Surles; (2)

---

[2]Although there are references to "St. Clair's Pell City Facility," the court assumes that the facility is owned by the County and operated by the Sheriff.

Marcrum; (3) Reasons; (4) Southern Health; (5) St. Clair County; and (6) Pell City.

Similarly, plaintiff also raises two claims in Count II, which is captioned "Wrongful Death." In paragraph 89, plaintiff alleges that four defendants—defendants Reasons, Malone, Wade, and Kilpatrick—"owed a duty to Smith to meet the standard of care applicable . . . to inmates with diabetes and/or make sure that those under their supervision were trained adequately . . . and that adequate policies and procedures . . . were in place," but said defendants "negligently and/or wantonly violated this standard of care or caused it to be violated with the foreseeable result that Smith suffered unnecessary pain and suffering and, ultimately, died."  And in paragraph 90, plaintiff alleges that defendant Southern Health "is liable for the[] negligence and/or wantonness" of its personnel—*i.e.*, Reasons, Malone, Wade and Kilpatrick—because they "were acting within the scope of their employment."

## Answers Filed

Three Answers have been filed in response to plaintiff's FAC.  None of these defendants have filed a motion to dismiss.  The first was filed by defendants Southern Health Partners, Kilpatrick, and Reasons on November 15, 2010, and it included a laundry list of thirty-nine (39) affirmative defenses. Second, defendant Pell City filed an Answer on December 29, 2010, and it likewise included a laundry list of forty-two (42) affirmative defenses.  Third, defendant Wade filed an Answer on January 3, 2011, and it also included a laundry list of forty (40) affirmative defenses.

## Other Matters

Defendant Malone died sometime after the events plaintiff now complains of.  Because of this, plaintiff filed a Motion for Appointment of Administrator Ad Litem to Represent the Estate of Defendant Diedre Malone, Deceased, which the court granted by consent. Subsequently, the court

14

entered an order on March 7, 2011 appointing Albert Trousdale, Esq. "as Administrator Ad Litem solely for the purpose of representing the Estate of Diedre Malone, deceased in this litigation." On December 29, 2010, the court granted "Defendants' *Unopposed* Motion to Stay Discovery and Temporarily Suspend Obligation[s] Under Rule 26 Pending Resolution of Motions to Dismiss the First Amended Complaint." (emphasis added).

<u>VARIOUS GROUNDS FOR DISMISSAL RAISED IN DEFENDANTS' MOTIONS</u>

The various motions filed by the defendants in this case can be said to fall within three categories.  The categories are: (1) defendant St. Clair County's Motion to Dismiss; (2) the Motions to Dismiss filed by defendants Surles, Marcrum, Moss, Gaston, Mitchell, and Stinson;[3] and (3) defendant Foreman's Motion to Dismiss.

**A.    Defendant St. Clair County's Motion to Dismiss.**

The category relating to defendant St. Clair County's Motion to Dismiss consists of five documents: (1) Motion to Dismiss; (2) Memorandum Brief in Support; (3) Reply Brief; (4) Submission of Additional Evidence in Support of its Motion for Summary Judgment; and (5) Response in Opposition to Plaintiff's Motion to Strike.  The County's Motion to Dismiss raises one chief ground for dismissal and states three reasons in support.  The three reasons raised in support coincide with Parts A-C of the Memorandum Brief filed contemporaneously therewith.

---

[3]  In the initial motion to dismiss to fall under this category, as well as the Memorandum Brief in Support, only defendants Surles, Marcrum, Moss, Gaston, and Mitchell were listed as the parties filing said motion. Subsequently, defendant Stinson also filed a motion to dismiss, and  "adopt[ed] the relevant portions of the Defendants' previously filed memorandum brief." After defendant Stinson filed his motion to dismiss, two other submissions were filed in relation to this category, both by defendant Stinson along with defendants Surles, Marcrum, Moss, Gaston, and Mitchell.  Those submissions were: (1) Defendants' Reply to Plaintiff's Response to Defendants' Motion to Dismiss the First Amended Complaint; and (2) Defendants' Submission of Highlighted Cases.

Defendant Stinson may misnumber parts, but uses the correct wording of the headings.

- The chief reason specified in the County's Motion to Dismiss is that "St. Clair County has no statutory duty or authority to operate the St. Clair County Jail or to supervise the jailers or inmates."

- The three reasons  St. Clair County states in support are:

  - "A.  St. Clair County fulfilled its statutory duty to adequately fund the jail for inmates' medical treatment."
    - In essence, the County argues that its sole duties were to "build, maintain, and fund the jail," yet plaintiff has failed to allege any claims concerning these duties.

  - "B.  St. Clair County is not legally obligated to pay for the medical expenses for municipal inmates such as Smith."
    - Here, the County argues that there was no monetary incentive for it to withhold medical treatment from municipal inmates such as Smith.  First, it claims Pell City "had a contractual obligation to reimburse the County for Smith's medical care."  Second, it contends "municipalities [*i.e.*, Pell City], rather than counties [*i.e.*, St. Clair County], are responsible for housing costs and medical expenses of municipal inmates housed in county jails." (citing *Town of Kinsey v. Hadden*, 578 So.2d 1338, 1339 (Ala. Civ. App. 1991)).

  - "C.  Attaching the Pell City Agreement should not result in a conversion of this motion to a motion for summary judgment."

Subsequently, the court entered an order on January 5, 2011, denying the third reason (*i.e.*, "C") listed above.  The order stated: "The court will consider the Motion to Dismiss filed by defendant St. Clair County on November 22, 2010 as a motion for summary judgment and will therefore consider the agreement(s) relied upon by said defendant." The agreement, which the County refers to as "the Pell City Agreement," is attached to its Memorandum Brief as Exhibit A and is entitled "Copy of Agreement between St. Clair County and City of Pell City."  In essence, this agreement describes the services provided by the County while housing the City's inmates, how the City will compensate the County, billing and payment procedures, the duration of the agreement, and other miscellaneous provisions.  The Pell City Agreement  should not be confused with the Health Services Agreement between St. Clair County and Southern Health Partners, which is attached to

plaintiff's FAC as Exhibit 1.

The Pell City Agreement referenced above was in effect from March 1, 2003, to February 28, 2006.  After the court entered the order notifying the parties that the County's motion to dismiss would be treated as a motion for summary judgment, the County filed a Submission of Additional Evidence in Support of its motion for summary judgment.  Included within this submission was an updated copy of the agreement between St. Clair County and Pell City.  It was executed on December 23, 2009 and will remain "in effect for three (3) years beginning March 1, 2009 and ending February 28, 2012."[4]  Therefore, neither this subsequently-filed 2009 agreement nor the previously-referenced 2003 agreement were, by their terms, in force at the time of the incident plaintiff now complains of, November 18, 2008.  On this point, the County filed an affidavit by Kellie L. Long, Administrator for the St. Clair County Commission, where she avers: "St. Clair and Pell City continued their respective performance under the terms of the [2003] Agreement after it had expired . . . ."

The County's subsequent Reply Brief makes two points rebutting Plaintiff's Response in Opposition.

- First, the County asserts that plaintiff wrongfully attempts to place the burden on the County. Rather than meeting her own "burden of showing a plausible claim against the County by providing factual allegations sufficient to 'raise a right to relief above the speculative level,'" the County contends , plaintiff tries to swap roles and make the County provide "definitive proof" that it adequately funded medical care at the jail. (*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546, 555 n.3 (2007).

- Second, the County claims that plaintiff's theory of liability is purely speculative.  It construes plaintiff's argument as claiming the County "somehow conspired with Southern Health Partners to intentionally withhold medical treatment from inmates to decrease its

---

[4]  Because the 2009 Agreement was executed on December 23, 2009 and is "in effect for three (3) years beginning March 1, 2009 and ending February 28, 2012," it is partially retroactive in effect.

expenditures on inmates' medical care."  To rebut this assertion, the County argues that it had no monetary incentive to withhold medical treatment from municipal (*i.e.*, city) inmates such as Smith.

Finally, the County raises a couple of arguments in its "Response in Opposition to Plaintiff's Motion to Strike."  Even though the court subsequently denied plaintiff's motion to strike after the hearing on February 22, 2011, two portions of the County's Response are still applicable to the issue at hand.

- (1)  "The HSA and the Pell City Agreement show that plaintiff's theory that St. Clair County participated in some scheme to withhold medical care from inmates for profit is fallacious."
  - The County argues that the two agreements prove it did not have a monetary incentive to withhold medical care from municipal inmates.  First, the HSA "uses a pre-paid fixed amount for medical services provided in the jail."  "Second, when medical services outside of the jail are required," the Pell City Agreement provides that the "City must pay for the costs."  Additionally, Southern Health Partners's medical personnel determined "whether municipal inmates require medical care outside of the jail facilities.  Therefore, "the County simply could not have saved any money by participating in some scheme to withhold healthcare from [municipal] inmates."

- (2)  "Summary judgment is due to be granted without need of further discovery."
  - Here, the County mostly argues that "Federal Rule of Civil Procedure 56(d) does not 'entitle[] plaintiff to discovery before dismissal.'  Instead, Rule 56(d) grants the court discretion to defer, deny, allow time for discovery, or 'issue any other appropriate order.'  Additionally, Rule 56(d) puts the burden on plaintiff to show 'by affidavit . . . for specified reasons, it cannot present facts essential to justify [her] opposition."  (Citations omitted and alterations in original).  The County's only other claim in this regard is that, while "Plaintiff's counsel has submitted an affidavit containing a litany of items he wishes to procure through discovery . . . . none of the items listed by Plaintiff's affiant would demonstrate that St. Clair County did not adequately fund the medical care for inmates at the St. Clair County Jail."

## B.    The Motion(s) to Dismiss Filed by Defendants Sheriff Surles, Chief Marcrum, Captain Moss, and Corrections Officers Gaston, Mitchell, and Stinson.

In all but one of the submissions in this category, the introductory paragraph (*i.e.*, "COME NOW Defendants . . . .") includes St. Clair County as one of the defendants submitting the document to the court, but these same documents fail to include the County in the document's title, though each

of the individual defendants are named.  Three reasons suggest that this is likely nothing more than a mere oversight by defense counsel.  First, all of the grounds for dismissal discussed in these documents relate solely to governmental actors, as opposed to government entities.  Second, the County filed a separate motion to dismiss.  Third, counsel for the County and the individual defendants named above are one and the same.  This category will be deemed to only relate to the six individual defendants—Surles, Marcrum, Moss, Gaston, Mitchell, and Stinson.

This category consists of five documents: (1) Motion to Dismiss; (2) Memorandum Brief in Support; (3) Defendant Alfonzo Stinson's Motion to Dismiss; (4) Reply Brief; and (5) Submission of Highlighted Cases.  In the principal motion to dismiss to fall under this category, defendants list the following reasons in support.  These reasons also coincide with the headings in the defendants' memorandum brief filed contemporaneously therewith.

- "I.  The [Amended] Complaint fails to allege a plausible supervisory liability claim against Sheriff Surles, Administrator Marcrum, or Captain Moss."

  - "A.  Supervisory liability claims are no longer available in actions pursuant to 42 U.S.C. § 1983."
    - This argument is derived from one recent Supreme Court opinion: *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  Defendants believe *Iqbal* establishes that "a supervisory official, like any other governmental official, may only be held liable for his or her own conduct resulting in a violation of a plaintiff's federally protected right."  Defendants concede that the Eleventh Circuit has applied the pre-*Iqbal* supervisor liability standard in a case post-*Iqbal*, *see Gross v. White*, 340 Fed. Appx. 527, 531 (11th Cir. 2009), but argue that the Ninth Circuit has held that *Iqbal* bars such claims.  Further, defendants state that three other courts of appeal have "expressed doubt over whether even a limited for of supervisory liability exists post-*Iqbal*."

  - "B.  Alternatively, the Amended Complaint fails to show a plausible supervisory liability claim[] under the *Cottone* standard."
    - Because the FAC does not aver that Surles or Marcrum personally participated in the events giving rise to this action, defendants claim that plaintiff must show that "there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." (quoting

*Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)).  Of the three ways to establish a recognized causal connection, defendants argue that plaintiff is unable to establish any of the three.  First, defendants claim the two cases cited by plaintiff fail to demonstrate "a history of widespread abuse." Second, plaintiff does not claim that defendants "directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them."  And third, defendants argue that plaintiff's claim that they "had customs or policies in place that resulted in deliberate indifference to Smith's constitutional rights" is conclusory in nature.  That is, defendants claim that plaintiff's factual allegations amount to nothing more than claiming, "because Smith's treatment was insufficient, some type of customs and policy issue also must have existed."

- "II.  These Defendants are entitled to qualified immunity because the Amended Complaint fails to allege a plausible Fourteenth Amendment claim against these Defendants based upon their personal participation."[5]

-
    - "A.  The Amended Complaint fails to demonstrate the subjective component requirement of a deliberate indifference claim."[6]
        - Here, defendants argue that plaintiff cannot establish the subjective component as to either Gaston or Mitchell.  As to defendant Gaston, defendants argue that the FAC's "only specific factual allegation involving him states that Smith and his medical conditions were 'well-known' to Gaston." Because the FAC does not allege that Gaston "knew or saw anything regarding the decedent's condition during the time in question," defendant argues that plaintiff is unable to show that Gaston possessed the subjective knowledge necessary to establish deliberate indifference.
        - In regards to defendant Mitchell, the FAC's "only specific allegation against her states that she was present when Nurse Wade checked on Smith at 8:00 a.m. on the day of Smith's death and that Officer Mitchell knew, along with Nurse Wade, about Smith's refusal to take his medication and eat."  But

---

[5]  In the preface to Part II, defendants assert that "Plaintiff must shoulder three burdens," which are:

First, she must satisfy the objective component by showing that [the deceased] had a serious medical need.  Second, she must satisfy the subjective component by showing that the official acted with deliberate indifference to [his] serious medical need.  Third, as with any tort claim, [the plaintiff] must show that the injury was caused by the defendant's wrongful conduct.

(Quoting *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007)).  "Defendants do not contest that Smith's diabetes satisfies the objective component of the deliberate indifference analysis."

[6]  To satisfy the subjective component, a "'[p]laintiff must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.'"  (Quoting *Goebert*, 510 F.3d at 1326-27).

> simply being aware of this fact, defendants claim, is insufficient to show that "Mitchell disregarded any risk to Smith by conduct greater than gross negligence."

- "B.  These Defendants were entitled to rely on Southern Health Partners medical personnel to provide Smith with appropriate medical care."
  - Because defendants use vague descriptive terms in this section (*i.e.*, "these Defendants"), it is hard to determine exactly what defendants are being referred too.  Nevertheless, it is best to divide this argument into three parts.
  - First, defendants claim Gaston and Mitchell should be entitled to rely on the medical judgments made by medical professionals responsible for inmate care.
  - Second, defendants argue that Gaston and Mitchell—laymen—should not be required to substitute their judgment for that of Southern Health Partners's medical professionals.
  - Third, defendants argue that the plaintiff's FAC fails to show causation, which is a necessary element to any deliberate indifference claim, "because there was no wrongful conduct by them or any jail personnel" that caused Smith's injury.

- "III.  These Defendants are entitled to qualified immunity because clearly established law demonstrates that these Defendants had no duty to intervene in Smith's medical care once he obtained treatment from Southern Health Partners' medical professionals."
  - In Part III, defendants argue that two principles can be gleaned from the body of clearly established law relating to this case.
  - First, defendants Gaston and Mitchell "had no duty to intervene in Smith's medical treatment once he was turned over to Southern Health Partners' medical personnel for treatment," even if their medical determinations proved incorrect.
  - Second, defendants Gaston and Mitchell could reasonably rely upon the treatment decisions of Southern Health Partner's [sic] medical personnel."

Even though defendant Moss is included in Part I's discussion of supervisory liability, this point was later clarified by both plaintiff and defendants' submissions.  In plaintiff's Response to Defendants' Motions to Dismiss, she states:

> Defendants mistakenly treat plaintiff's liability theory concerning defendant Moss as based on a supervisory role.  While plaintiff alleges that Moss supervised jailers at the Pell City jail, plaintiff did not make specific allegations against her as a policymaking official.  Rather, plaintiff alleged that Moss was a participant in the constitutional violations that resulted in the death of Smith.

Defendants respond to plaintiff's clarification by stating: "Regardless, the same arguments

apply to Moss as applied to the other correctional officers," *i.e.*, defendants Gaston Mitchell, and Stinson.

The arguments in Parts II and III above also apply to defendants Stinson and Foreman. At the time defendants filed their initial motion to dismiss, neither Stinson nor Foreman had been served. After being served, however, counsel for defendants Surles, Marcrum, Moss, Gaston, and Mitchell began representing defendant Stinson as well. While Stinson filed a separate motion to dismiss, it merely "adopted the relevant portions of the defendants' previously filed memorandum brief." In particular, Stinson adopted Parts II and III of defendants' motion to dismiss. On the other hand, defendant Foreman has acquired representation from separate counsel, though she adopts the defendants' memorandum brief in full.

Finally, defendants note the Eleventh Circuit's distinction between *clinical* and *administrative* decisions in *Howell v. Evans*, 922 F.2d 712, 723 (11th Cir. 1991). The court stated: "We do not dispute [the defendant-supervisor's] right to rely on medical professionals for *clinical* determinations." Nevertheless, the court determined that qualified immunity was not applicable because the defendant's decisions "were *administrative*" and rose to the level of deliberate indifference.[7]

## C.    Defendant Jackie Foreman's Motion to Dismiss.

The final category consists of four documents filed by defendant Foreman: (1) Motion to Dismiss, (2) Brief in Support, (3) Reply Brief and (4) Supplemental Brief in Support. In the Motion to Dismiss, Foreman includes fourteen (14) grounds for dismissal:

- "1.   The complaint fails to state a claim upon which relief can be granted.

---

[7] This court views the non-medical defendants as administrative officials.

- "2.  The complaint fails to state a claim upon which relief can be granted pursuant to 28 U.S.C. § 1331 jurisdiction."
- "3.  The complaint fails to state a claim upon which relief can be granted pursuant to 42 U.S.C. § 1983."
- "4.  The complaint fails to state a claim upon which relief can be granted pursuant to the doctrine of Respondeat Superior."
- "5.  The complaint fails to state a claim upon which relief can be granted in the form of punitive damages."
- "6.  The complaint is barred by the pertinent statute of limitations and/or the doctrine of laches."
- "7.  The plaintiff has failed to join the necessary and indispensable parties to this action."
- "8.  The Defendant contests the form and sufficiency of process and of service of process."
- "9.  The plaintiff lacks standing to bring this cause of action."
- "10.  Defendant pleads all available doctrines of immunity and privilege, including, but not limited to, Qualified Immunity."
- "11.  The complaint fails to state a claim for Violation of the 14th Amendment, Deliberate Indifference to Serious Medical Needs pursuant to 42 U.S.C. § 1983 (Count I) upon which relief can be granted."
- "12.  The Defendant is immune from punitive damages in this action."
- "13.  The Defendant pleads all forms and doctrines of waiver and estoppel."
- "14.  The Defendant reserves her right to amend this Motion to Dismiss during the discovery process."

In contrast to Foreman's Motion to Dismiss, the Brief in Support states only  three reasons

in support.  They are:

- "A. Jackie Foreman is entitled to Qualified Immunity because the First Amended Complaint fails to allege a cognizable 14th Amendment claim against her in her capacity as a corrections officer."
- "B. Jackie Foreman is entitled to Qualified Immunity because there is no clearly established law that Jackie Foreman had a duty to intervene in the decedent's medical care once he came under treatment from Southern Health Partners' medical professionals."
- "Jackie Foreman adopts by reference the Brief as heretofore filed herein on behalf of the other correctional officers in support of her motion."

Similar to Foreman's Brief in Support, her reply brief "adopt[ed] by reference the Reply Brief

filed on behalf of the other correctional officers in support of her motion as if fully set forth herein."

Foreman's final submission is her Supplemental Brief in Support.  After a fairly thorough

review of the standard governing qualified immunity, Foreman asserts that "Plaintiff points to only

23

two cases in an attempt to show a right clearly established through 'concrete factual context' in previous case law with regard to the claims against defendant Foreman and the other correctional officers named as defendants."  The first case, *Howell v. Evans*, was addressed in greater detail by the other Defendants' Reply Brief. As to the other case, *Townsend v. Jefferson County*, 601 F.3d 1152 (11th Cir. 2010), it merely reiterates the deliberate indifference test that Foreman says she did not violate because she "properly relied on the medical personnel employed for purposes of making clinical decisions with regard to the inmates and who were present at the time of Plaintiff's incarceration."

<u>DISCUSSION</u>

The court is bound by the somewhat self-contradictory language in the *Iqbal* case which includes:

> To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical.  We do not so characterize them any more than the court in *Twombly* rejected the plaintiffs' express allegation of a "contract, combination or conspiracy to prevent competitive entry," because it thought the claim too chimerical to be maintained.  It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1951 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 551 (2007)).

This court, however, also notes the following language:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Twombly*, 550 U.S.] at 570.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court *to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id*., at 556.  The plausibility standard is not akin to a "probability requirement," but

it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid. Where a complaint pleads facts that are merely consistent with" a defendant's liability it "stops short of the line between possibility and plausibility of entitlement to relief."* *Id.*, at 557 (brackets omitted).

Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.*, at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Id.,* at 556. *Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be context-specific task that requires the reviewing court to draw on its judicial experience and common sense.* 490 F.3d at 157-158.[8] But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. *When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief* [9].

---

[8]Note that this language apparently applies even if the allegations are not conclusory.

[9]Suggesting that allegations whose veracity is assumed may still be implausible. The real unanswered question is, what does plausible mean in the context of the two cases? How does one relate, "It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that entitles them to the presumption of truth," to "when there are well-pleaded factual allegations, a court should assume their veracity and *then* determine whether they *plausibly* give rise to an entitlement to relief," and which "requires the reviewing court

*Iqbal*, 129 S.Ct. at 1949-50 (emphasis added) (parallel citations omitted).

This language suggests that even if a complaint's allegations are not conclusory, the trial court must further apply its common sense and judicial experience in determining whether the allegations are "plausible." It also suggests that the trial court must, to some extent, weigh or otherwise measure the allegations to determine plausibility.

Most of the articles and commentaries which have followed the two cases emphasize the uncertainty which they have created. This is not unusual for Supreme Court cases which often have a Pavlovian air about them leading to predictable divisions on the court.[10] This court calls attention to the May 2010 issue of "The Federal Lawyer" (Vol. 57, No.4) and 8 Law Week, 2782. The court also calls attention to the following law review articles: A. Benjamin Spencer, *Understanding Pleading Doctrine*, 108 Mich. L. Rev. 1 (2009), and Nicholas Tymoczko, Note, *Between the Possible and the Probable: Defining the Plausibility Standard After* Bell Atlantic Corp. v. Twombly *and* Ashcroft v. Iqbal, 94 Minn. L. Rev. 505 (2009). There are no easy answers to issues involving *Twombly* and *Iqbal* and/or qualified immunity. Some unavoidable subjectivity is involved at all levels.[11] Trial courts can only do their best.

The court's first determination is that the claim(s) against St. Clair County are due to be dismissed. Conspiracy type claims are particularly suspect when there are no allegations of specific agreements or understandings. The plaintiff attempts to fall back on "implicit"

---

to draw on its judicial experience and commonsense?"

    [10]See generally, *"The Dirty Dozen,"* Levy and Mellor, Sentinal, 2008.

    [11]Not all judges have the same "common sense" or "judicial experience."

agreements or understandings.  There are only conclusory allegations that the County dealt with

Southern Health while deliberately indifferent to the services that it would provide. In addition,

any allegations that any positions or conduct of the County caused harm to the decedent are mere

conclusions.  There are no factual allegations of any prior knowledge of the County of deliberate

indifference by Southern Health.  Further, the sheriff and not the County is ultimately responsible

for the operation of the county jail.  See *Lancaster v. Monroe County*, *Alabama*, 116 F.3d 1419,

1430 (11th Cir. 1997) and *Turquitt v. Jefferson County*, *Alabama*, 137 F.3d 1285, 1289 (11th Cir.

1998).  The motion(s) to dismiss of the County will be granted.

The claims against the individual defendants present a different situation.  There are

allegations of participation or lack of required participation by a number of the individuals.

There are factual allegations that the medical needs of the deceased were deliberately ignored by

these individuals who allegedly knew of his dire straits and irresponsibly failed to monitor his

condition and to actively pursue the need for follow up treatment.  The court does not, of course,

determine the truth of such allegations, but only that they exist in the complaint.  The jail

officials against whom such factual allegations are made include: (1) Moss; (2) Mitchell; (3)

Gaston; (4) Foreman; and (5) Stinson.  The court will deny the motions to dismiss filed by these

defendants. These defendants could not avoid their constitutional obligations to monitor or seek

medical assistance by totally depending on Southern Health and its employees.[12]

The only other motions to dismiss have been filed by defendants Surles and Marcrum.

---

[12]   While this court will so rule, it recognizes that there may not be clearly established law with regard to
whether there can be total reliance by correction officers on medical personnel.  However, the court concludes that
these defendants knew or should have known that they could not turn a blind eye to the medical needs of the
deceased.  It would appear to be axiomatic that a person who is responsible for the care and custody of prisoners is
deliberately indifferent if he or she knowingly, willfully and fully abdicates that responsibility even to professionals
who also have such responsibility.  At the least, there would appear to be a question of fact.

These defendants have acknowledged that they concede that the Eleventh Circuit has applied the pre-*Iqbal* supervisory liability standard in a case post-*Iqbal*.  *See Gross v. White*, 340 Fed. Appx. 527, 531 (11 th Cir. 2009).  This court is bound by such a determination.[13]  The remaining issues as to Surles and Marcrum are whether there are *Iqbal* required factional allegations regarding them, as opposed to conclusory allegations; and whether they are entitled to qualified immunity.[14]  The court concludes that the allegations against Surles and Marcrum are at least sufficient to allow discovery as to the claims against them.  Further, that if the borderline conclusory claims against them may be maintained based on factual allegations, they would not be entitled to qualified immunity.  Their motions to dismiss will be denied.  The initial discovery will, as to Surles and Marcrum, be limited to a determination of their knowledge and/or participation.[15]

This the 12th day of April, 2011.

*Robert B. Propst*

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[13]  Also see the post-*Iqbal* cases relied upon by the defendants are not controlling, they are not persuasive when their facts and law are compared to this case.  Some of the cases only express doubt as to the *Iqbal language*. *Also see Christman v. Walsh*, No. 10-14127, 2011 U.S. App. LEXIS 4250 (11th Cir. March 2, 2011).  *Compare Simmons v. Navaho City*, 609 F.3d 1011, 1020-21 (9th Cir. 2010) with *Starr v Baca*, No. 09-55233, 2011 U.S. App. LEXIS 2798, at 5-11, 25-27 (9th Cir. Feb. 11, 2011).

[14]An action against Surles in his official capacity cannot be maintained because he is a state officer.

[15]  In general, the court notes the case of *Connick v. Thompson*, ___ U.S. ___ (March 29, 2011).